The next case on the calendar is Exclusive USA Marketing versus Cusinota. Good afternoon, Your Honors. And may it please the Court, I'm Gary Gamell. I represent the plaintiff in this action. Originally the parties were the McMackins. They signed their interest in the net proceeds agreement to Exclusive USA Processing, which is the plaintiff in this action. What I wanted to do to address the Court is to raise two factual misrepresentations that I think are critical to the issues at this hearing. Touched on the net proceeds agreement, the agreement for electronic payment processing as to how they affect the processing issue, and then the alter ego and the RICO matters and the basis for reversal and remand. And I would like to reserve also some time for rebuttal, hopefully five minutes. On the first matter, USA Payment Systems is the entity that in fact owns the processor in question. And the basis for that is the declaration of Mr. Kuchinada, which is in the excerpts of record at page 109-110. And where this becomes important is because USA Payment is in all the briefings is held out to be the entity that in fact is the owner of the processor. And USA Payment is supposedly a marketing arm for USA Payment Systems. And this is important because it comes into the second phase and the second misrepresentation that is critical is that USA Payment was not incorporated until June 25, 1997, some 24 days after the agreement for electronic payment processing was signed by USA Payment. And another fact that's important is that USA Payment, the Robert Kuchinada and Kareem Mascottia were the shareholders. Kareem Mascottia was the CEO. And the reference for those to – Let me clarify the lay of the land here. You have a RICO claim. You have a breach of contract claim? Negative. I'm sorry? We had a breach of contract in the earlier case. The parts had settled. There's actually been – that portion of the case is history at this point. That was against USA Processing, which is the – Right. Basically the processing company. Right. And Robert Kuchinada and Kareem Mascottia are also the sole officer shareholders of that entity. But the breach of contract claim is a history because you have a judgment? We have a judgment. Okay. Then you have a freestanding alter ego claim of some kind? We have a RICO alter ego claim against Mr. Kuchinada and Mascottia. So your understanding is that that's a RICO claim against the two of them? Yes. Based on an alter – so it's not that it's an alter ego claim. It's a RICO claim in which you're trying to reach them on alter ego theory. And the reason being is that because of their dealings with the AEPP agreement and the manner of fact which they did deal with that, that clearly would be an alter ego. Not trying to reach USA payment on the RICO claim? No. No. Only the others. That seems like it would be a much easier thing to do than to reach the two of them. Well, unfortunately, they get dismissed out of the case. So in other words, you don't believe you have a RICO claim if they're not involved, if you don't have this alter ego theory? Well, USA payment – how the RICO claim fits in here, USA payment is not a corporation, not an entity. At best, it's two individuals operating under the name of a DBA of USA payment. And therefore, those two individuals, not USA payment, and that's the fact that I just mentioned that none of the briefs address and should have addressed at the beginning of the case. Because that misled not only the court, Judge Ware, when he reviewed the initial motion, he talks to USA payment. We all believe USA payment was a corporation, but the fact that it is not a corporation, the fact that it's just two individuals, because the corporation wasn't even in existence, it wasn't even filed, and those two individuals – What you're saying is that when you're reaching the two of them, you are reaching USA payment. Yes. That's all they are. Right. But we're reaching them in their individual capacity because USA payment didn't exist and wasn't an entity. Then why do you need alter ego theory then? Well, the alter ego comes in that those two individuals were the directors of USA processing. And USA processing is the entity that my clients contracted with under the net proceeds agreement, the APA. NPA, excuse me. And the reason that is critical is that our allegations and our complaint is that the processing fees that were generated through the AEPP agreement should have been an agreement with USA processing, not USA payment. And had it been with USA processing, my clients would have been entitled to 25% of the net proceeds that were generated from that particular agreement. And what is interesting is in the NPA, the NPA does make a provision for a switch to be made. And developed by these people. And this was right at the inception of the relationship. So when you put a provision in an agreement that says, we're going to develop a switch, USA one, this is the way it was addressed in the net proceeds agreement, we're going to set it up, but we shall, not will, might, maybe, we shall provide USA processing with all of its processing charges. And knowing that, but we shall charge USA processing, five cents a transaction, up to a million five over that. It will be a million, be three cents a transaction, basically calculated on a monthly basis. So what happens is this provision sits in there where this activity from the AEPP agreement, if it had been with USA processing, Mr. Kuchinada and Mr. Mascottia would only be realizing 75% of the profits from that entity, as opposed to 100%, which they tried to do by moving this over to. What about the notion that because of the net proceeds nature of the NPA, the processing fees would have backed out anyway? They do. I'm sorry? But they do back out. But the way they back out is as it's spelled out in paragraph 12 of the NPA. So basically what you're saying is that they could back out the amounts that are in paragraph whatever, but they couldn't back out all of them. Exactly right. There is an increment there? Do we know there's an increment? I'm sorry? Do we know that there is an increment? Oh, yeah, definitely. And I'll tell you what the increment is. Our agreement was for five cents a transaction through USA payment systems slash USA processing. The agreement with Bank of America Merchant Services was for 15 cents a transaction, so there's 10 cents, and that is in paragraph I think it's 1.1 or 2.1 of the AEPP. So there is a 10% spread that's built into the deal. I think even more critical to this is you have to remember that like any business, you can only make profit if your costs to do business are less than what you can sell a business for. So everything that USA processing does is a grouping of services and pushing these services on to merchants and being able to sell those at a price to the merchant that are greater than the cost to USA processing. Every increment of the business gets an add-on. I mean, this is just the nature of the beast. And the other critical issue is that within the processing business, there's literally only one source for revenues, and that one source is the merchant. And the merchant is the one that literally pays the total gross money into this processing industry. And then those fees get divided up amongst the various parties down below. And so to try to separate the processing out and say this is some supernatural sum coming from this bank that's separate from anybody and everybody else just belies the nature of the beast in the business. But again, the claim here is that the contract with BA was for processing and not for the merchant-level equipment or adding more merchants to the system. And it was a contract at a different level than what USA processing had been doing. That's what the unbelievers would like you to believe. Why shouldn't I believe it? Well, the reason is that this whole arena is just this mid-ground. USA processing has always been involved in processing. They had Comlink doing the processing initially. Then it comes to USA payment systems ultimately taking that over. That's the same fee that was deducted at the Comlink's fee was deducted. These services do not work unless you have this switch in the middle. And the switch is just nothing but. . . Well, you're saying the difference is that they used to contract it out, and now they're doing it themselves essentially. Right. I mean, we contracted out to Comlink initially. We paid them their nickel. We got anything over in that. Now all of a sudden it's different. We're going to pay $0.15. Bank of America is going to pay $0.15, and that does not fit in. Do you want to tell us briefly what your RICO claim is and why Mr. Corey erroneously dismissed it? Yes, the RICO claim simply is this, and I think it's strengthened by the fact that the lower court did not know that USA Payment was literally not a separate entity but was just a couple of individuals doing business. And the RICO claim is that, and you have to add another ingredient, BRE, who is the CEO for Bank of America Merchant Services, who was negotiating the AEPP with, in this case, initially USA Process, and then at the very last minute supposedly it gets inked by USA Payment, which is not even an entity. He, in his declaration, says that USA Payment is a switch, which is false. The record doesn't state that at all. It's USA Payment Systems. And he also says that there's no other switches out there, basically that this is the only one that can. . .  USA Payment Systems is a corporation. And the agreement with BA is with. . . USA Payment. It's the name game. And as you notice. . . Well, I gather these two individuals are also the primary individuals in USA Payment Systems. My understanding is they own part of it, that the remainder principals are two of the parties from Comlink, from the technical side that are also participants in that entity. The USA Payment Systems owns the switch. USA Payment Systems owns the switch. And, again, the authority of that is Mr. Cuccino's depositions, or his declarations that were submitted. Hold on a moment. The district court dismissed because he said you had him adequately proved an injury. And you say you have adequately proved an injury. Adequately proved an injury is really simple. Calculate $0.10. We can divide it by $0.15, reduce it to the number of transactions, and take out. And why else did he dismiss it? That's the only reason? No. Well, the other. . . That was the damage issue. The other issue on the RICO was there was no causal connection between the bribes that were offered BRE. And the question is interesting. As I say, his declaration is basically useless because he says. . . Who's he? I'm sorry. I'm sorry? Who is he? He is the CEO of BAMS, Bank of America Merchant Services, the other party to the AEPP. And what we are saying is that if you look at the record that's before the court, all of the preliminary acts took place with USA Processing, not with USA Payment. USA Processing did either directly as the company or through its directors, shareholders, Robert Cream and Mr. Mosquitita, did all the preliminary phases of this thing. And then all of a sudden at the 11th hour, the inking of the signature, instead of with USA Processing, becomes USA Payment, a non-entity that doesn't even exist. And we allege that there were bribes, that there was money that transferred back and forth between the parties. We have the testimony from Dave McMacken as to that fact in his sworn declaration that he was aware of and witnessed the acquisition of expensive $25,000 watches, went across the table and there's a laundry list of other items. And we said that but for those bribes, why would Bank of America enter into a contract with a company that doesn't even have the switch and a company that doesn't even exist unless there's some insider trading or something going on? Probably because they don't care. I mean one possibility is because they don't care one way or the other. These are handing millions of dollars in transactions. This is a very big business. The bulk of the business is the ARCO pay point. Every time you swipe a debit card at the ARCO station, $0.40 gets thrown into the hat and gets divvied up by the parties that are involved and part of that comes, that $0.15 of that comes into this contract. It's huge. And BAE should care because full size is just for responsibility reasons? Well, the integrity of the entire industry for one thing. Do we want bribes going back and forth? Forget the bribes. I don't mean to forget them, but you need to demonstrate that but for the bribes, they wouldn't have entered into an agreement with this entity. They couldn't have because the company didn't even exist for first. I understand that originally, but if these people then come and say, you know, instead of having the agreement be with USA Processing, we're going to create a new entity and we're going to sign it with them, and the question is why would BAE care? Well, I think BAE would care a lot simply because of the ultimate integrity. Quite honestly, the USA Payment Systems switch wasn't even online until sometime about a month after the AAPP was entered into it. They were using Comlink and all the USA Processing to get everything through, so they weren't even using USA Payment Systems slash USA Payment. I understand all that, but the question is, if for some reason the other side of this transaction wanted to change the formats involved, I mean, there may be problems with them doing that from your point of view, but leaving that aside, why would BAE care such that they had to be bribed to do it? Well, if I were BAE, merchant services, you know, it's hard to step into their minds, but I would think that, I mean, clearly USA Processing could provide the same services. Right, but why do they care? The USA Processing people come and they say, when we're going to form a new corporation, if for our internal purposes it makes more sense to do it this other way, and you're suggesting that BAE had to be bribed to go along with that. The question is why? Well, I think the reason they had to be is very simple. Since USA Processing was the entity that was doing all the preliminary work negotiations, getting paid for services performed, and then you go to switch at the last minute and all of a sudden go to the USA payment system, excuse me, USA payment, which doesn't exist, I think the only way you can literally make that leap is to the implication that, but for this money being changed hands, they wouldn't go that way. It's pure and simple. Well, that's what bribes are all about. That's the grease that makes things happen. Well, it may have been a bribe to get them to do this in the first place, but that's not what you're alleging. In other words, theoretically, it could have been a bribe to get BAE in the first place to agree to let USA Processing do the switch, but that's not your RICO claim. The RICO claim is that these bribes caused us, we've got our damages, and as a consequence of the RICO we're not able to bridge and get back in because the money basically is all diverted by this conduct. They literally move everything off to a charade entity. Who are the principal officers in USA Processing? The same gentleman, Robert Cucinato and Karim Maskatia. I'm still trying to understand why you need the alter ego theory. Because what they basically have done, because if you have the two individuals who are basically DBA USA payment, and USA payment systems really doesn't fit into this. At the time of this motion we didn't know that, that the USA payment was a DBA. So the fact that USA payment is not a corporation is not in the record any place? It is in the, the only place it's in the record is in our reply brief. Up here at the Court of Appeals? It's not in the lower court. So in the trial court record on the summary judgment papers, if I were to go through all the summary judgment papers, it's not there. And the reason it's not there. So what do we do with that fact? It's real simple. It wasn't before the district court. Well, it's an obligation, basically it's a fraud on the court as I see it. It's an obligation of counsel to make, on the other side, to present to the court and to ourselves the facts. Let me ask you, did you have a chance to do any discovery in the district court? We did, but this motion was first out of the, you know, in the first part of the proceedings discovery basically took place after that. This was not literally discovered until the deposition of Robert Cucinato was taken, which was years too later. But I don't understand. The case was dismissed. So what, you were still taking discovery after that? No, we got a judgment against USA processing. Oh, I see. Because you had the judgment you were doing execution. So the district court judge entered a separate judgment on this part of the case. Exactly. And the rest of the part of the case continued on. And that's right. That's why the rest of the case is settled. What we have done is finished. We have our judgment. But no money. It hasn't been paid because there is no money. And in this case, then what we're requesting is to remand it and let us try this attempt to try to get the money back into USA processing or get it through the alter ego from Robert and Karim, who basically hijacked the money from USA processing. So there's nothing. USA processing doesn't exist today? It's basically a shell. It's still active. My last check at the California State Web site for the Secretary of State. But they have no money. And they have not paid the judgment. Okay. Thank you. Thank you. You're welcome, Your Honor. Good afternoon. My name is Ann Marie Wagoner, and I represent the defendants at police Robert Cucinotta and Karim Mosquettea. A summary judgment was entered in this case, and it should be affirmed in this court because my clients made a motion. They met their burden on that motion of showing that there was no genuine issue for trial and there were no specific facts raised that controverted any of the facts that were brought before the lower court on that motion. What the colloquy that I have just heard, there is very little of it that is either correct or has any support in the record. So I'm a little at a loss as to where to begin. Your Honor, it seems to me that your most vulnerable piece is this notion that there was no RICO injury. Why was there no RICO injury? There was no RICO injury, first of all, because at deposition the corporate representatives of Exclusive, David and Michael McNaghan, were asked repeatedly to please explain what the injury was, and they could not explain it. Well, they may not be able to quantify it, but it's fairly obvious what the injury is. No, Your Honor. There actually is no injury, and this is why. The agreement for electronic payment processing is an agreement whereby USA Payment was providing processing services to BA Merchant Services. The $0.15 fee that BA Merchant Services was paying to USA Payment was only for processing and nothing else. The net proceeds agreement between USA Processing and Exclusive is something different. USA Processing is not a processor. What USA Processing does is it recruits and services merchants to accept debit and credit cards. But there's a provision in the NPA agreement that seems to contemplate that there will be a processor set up, and it also seems to contemplate, specify. No, there isn't. It's in there. There is a provision in paragraph 12 which talks about the principles of USA Processing being able to set up a separate company to do processing. Right. Exactly. That is correct. That's correct. So it's not like this. It's correct. But it does not provide that the McMackens are entitled to share in any processing fees that this separate entity generates. The reference in that paragraph to the $0.05 per transaction, that refers to the processing fees that will be charged to the merchants that USA Processing is servicing. Okay. But if you believe the rest of their story, i.e., that there was a – I mean, I have more problems with the next sentence. But if you believe the rest of their story, that there was a bribe and that as a result of the bribe there was a switch of business that would have stayed in the United States Processing but instead went to this other entity, then there would be an injury. Now, you're saying that the story isn't true, but as to whether there would be an injury, if the rest of their story was true, there would be. I understand your question, Your Honor. I'm sorry I misunderstood it. No, there's not an injury because the processing fees are excluded from the agreement. And not only that, there is no way at this level, at this appellate level, and there was no evidence before the court below, of what the injury is. And what the cases we cite in our brief say is that on a motion for summary judgment, if the moving party says and puts forth evidence, there is no injury.  One of which was because they couldn't produce any evidence of injury at their depositions. Then it behooves the opposing party to come forward and show what that injury is. And here, there's no evidence of that. There's no evidence now. There was no evidence in the lower court below. This argument about a spread that appears in the reply brief, there's no basis for that in the net proceeds agreement. Paragraph 12, where it talks about a $0.05 per fee processing fee being charged, that's referring to the actual fee that is charged to the merchants that are doing processing. All right, but it is some indication of what the cost of doing the processing is as opposed to the profit. And what they're really saying is we were entitled to the profit. Now, you're saying they're not, and that's a different story. But as to whether if the rest of their story is correct, there is an injury from that spread, that seems to me to be a fair reference from the record. But let's go to the next stage, okay? So then we have the next stage, which is this causation issue. Do you want to address that? Certainly, Your Honor. There is no evidence that, first of all, USA Processing and BA Merchant Services were in negotiations to enter into this agreement for electronic payment processing. There simply isn't. What about their notion that the dates were that it was actually incorporated after the agreement was signed? First of all, that is brand new on the reply brief. Isn't that true? Pardon me? Is that untrue? Your Honor, I don't know. I don't know if it's true or not. Assuming that it is true, that would mean that the company was There are some documents coming out of U.S. Processing that seem to deal with this agreement before payment was existing. There is no way to determine from looking at these documents, which are not authenticated. There's no information as to what they are. There's no way to tell whether or not the negotiations for the agreement for electronic payment processing are going on with USA Processing. Did the district court exclude those documents? There was no evidentiary ruling made on the documents, so I must assume that the court considered them. So there's no evidence of that. And assuming even if the company, if USA Payment was incorporated on June 25th, and it is a corporation, by the way. It's not a DBA. It's not Robert Cucinotta and Kareem Mosquettea doing business as some company. It is a corporation. U.S. Payment. Pardon me? U.S. Payment. I'm sorry. Did I say USA Processing? Excuse me. USA Payment. And USA Payment Systems as well. Are all these entities or corporations? Absolutely, Your Honor. Probably for factual purposes, the most important document in this case is the declaration of Robert Cucinotta. It was uncontroverted, and that's the panelist's excerpts on the record, pages 104 through 114. And paragraphs 17 through 20, which appear on pages 109 and 110, explain what USA Payment Systems is. It owns the switch. USA Payment is the marketing arm. And then paragraph 20 explains that USA Payment Systems authorized USA Payment to enter into the agreement for electronic payment processing. That's all in there. So these are all corporations. So assuming that it was incorporated on June 25th, most all that shows that there was a contract dated June 1st, 1997. Perhaps the officers ratified the contract that was entered into on that date. They had to be talking to somebody on June 1st. If the corporation didn't exist, who were they talking to? Pardon me? They had to be talking to somebody on the day they entered the corporation. USA Payment was. USA Payment was. They were negotiating the contract. And there was a contract signed on June 1st, 1997. And all I'm saying is there's no evidence in the record that USA Payment was indeed incorporated on June 25th. If it was, I don't see why that matters. You're saying they just basically executed a subagreement with USA Processing. A subagreement? Well, they later contracted to perform those services to keep the fees. You're assuming that you could have a corporation that doesn't exist signing an agreement on June 1st and then incorporating on June 25th. That's what I'm assuming without any facts in the record. Ordinarily, corporations that don't exist don't sign contracts. Ordinarily not, but perhaps none of this was in the record. If this had been raised below, then perhaps we could show the record. So the record does not show that this was incorporated on June 25th? It does not. It does not. And what is in the record is some documents that you're complaining about on authenticity grounds, but from which one may be able to draw an inference that there were some negotiations going on with U.S. Processing and some bills perhaps and some payments perhaps before U.S. Payment existed. I don't agree with that. I agree that there are these documents, yes, and I agree that the district court did not say I'm not going to look at these documents. But if you sit down and you look at the documents, I think it's because we don't know what the documents are, because the Declaration of David McNaghan provides no illumination as to what they are. It's just speculation and guesswork to try to determine what it is that those documents show. And for – Suppose we thought that the documents did show that there was some interaction with U.S.A. Processing and that a decision was made at some point, and one can infer that a decision was made at some point to set up U.S.A. Payment. Does the case depend further on being able to hook the bribes up to that decision? Absolutely. The plaintiff appellate has to be able to show both direct and proximate causation. And in this case, we have the declarations of Robert Puccinato, Kareem Mosquitieh, and Sharif Bayari, all of which say unequivocally and they're uncontroverted. They say that there was never anything that led B.A. Merchant Services to contract with U.S.A. Payment instead of U.S.A. Processing or some other entity. There certainly isn't any evidence in the record to show that there were any, quote-unquote, bribes that caused the contract to be with U.S.A. Payment instead of U.S.A. Processing. There just isn't any evidence there of that at all. With respect to the going back to the damages issue, again, if I might, the way that the net proceeds agreement was set up provided that the only profit in which Exclusive could share was if the fees that were paid came from merchants that belonged to U.S.A. Processing. And one of the reasons the damages theory falls apart here is that the merchants that U.S.A. Payment was processing transactions for under the agreement for electronic payment processing were not merchants that were U.S.A. Processing's merchants. These were B.A. Merchant Services merchants. The way to explain this best would perhaps be this.  It had to hire a third-party processor to process transactions. B.A. Merchant Services had to hire a third-party processor to process transactions. That was U.S.A. Payment. U.S.A. Processing does not process transactions. That's another step in the procedure, if you will, and that's spelled out in Mr. Puccinato's declaration. You have these merchants. A customer goes in. They want to pay for something with a credit card. They swipe the card. Something has to talk to the Visa network and to the various banks to determine whether or not that transaction should be approved. That's something that allows the terminal at the merchant's location to communicate with the banks and with the Visa MasterCard Associations is this processor. That's not what U.S.A. Processing did. Well, did U.S.A. Processing essentially subcontract that piece out? Pardon me? Did U.S.A. Processing essentially subcontract that piece out? All right, but it did. So the contract it had with its merchants did include processing, but it was contracting it out. It was contracting it out. But it was charging for it. It was charging for it, but there's no evidence in the record of the spread that Mr. McMacken is talking about where it was charging merchants more than it was actually paying to the processor. There's no evidence of that. There is no evidence of the spread. But from the merchant's point of view, it was doing the processing. They weren't paying it to do the processing. It just wasn't actually physically doing it. They had somebody else doing it. It wasn't physically doing the processing, and when it came time to give the McMackens their share of the proceeds under the agreement, they took out the processing fee. Of course, they were paying for it as a subcontract, but the contract in Paragraph 12 covers the possibility that they might decide not to pay for it. They might decide to do it with a separate corporation, and if so, the implication seems to be that then some of the spread would go to the McMackens. There is nothing in Paragraph 12 that talks about a spread. All that Paragraph 12 talks about is charging the McMackens or U.S.A. Processing or whatever you want to call it, five cents a transaction. So there is nothing about a spread. And if you look at the agreement for electronic payment processing. Presumably, if they're doing it themselves, it's costing them less than it's costing them to pay somebody else because they're going to take the profit instead of giving the profit to somebody else. There's no evidence of that. There may not be any evidence, but that's American capitalism, and that's why they were going to do it, right? That may be, but there's no evidence in the record of it. I mean, there are lots of things. Well, there is an evidence that when they did charge back a VA for it, they charged for 15 cents. No, there isn't. No evidence of that? The they charging VA merchant services, they is U.S.A. Payment. I understand, but okay. There is no evidence in the record that any of these merchants that U.S.A. Processing Presumably, U.S.A. Payments was making a profit, so they were doing it for less. But they're not charging it back to anybody. U.S.A. Payment has no relationship with the merchant. That's the difference here. Under this Agreement for Electronic Payment Processing, and this is spelled out in Mr. Kuchinada's declaration, the relationship with the merchant is between VA merchant services and the merchant. It is not between U.S.A. Payment and the merchant or U.S.A. Processing and the merchant or the mackets and the merchant. And that's where the distinction lies. It's a flat fee. It goes straight from VA merchant services to a U.S.A. Payment, 15 cents, end of story. So there is no spread, like is mentioned in the reply brief. And there is none in the NPA. Briefly, just with respect to the alter ego claim, I'm confused. Well, let me just say, in the second amount of complaint, the way it's pleaded is this. Mr. Kuchinada and Mr. Mascottia are alleged to be alter egos of U.S.A. Processing. There was a motion for summary judgment that was brought as to that allegation because there were claims that were pleaded against U.S.A. Processing. Breach of contract and an accounting had been pleaded against them. There was also a declaratory relief that had been pleaded, but that was thrown out without leave to amend on motions to dismiss, and that ruling has not been challenged in this court. So there was this alter ego claim. And so Mr. Kuchinada and Mr. Mascottia brought a summary judgment motion on the claim. So in the event that a judgment would later be brought for some reason against U.S.A. Processing under this accounting theory or under this breach of contract theory, they would not be personally liable for that judgment. The depositions of both Mr. David McMacken and Mr. Michael McMacken were taken. There was no evidence presented by either of them at their depositions to support the alter ego theory. And Mr. Kuchinada and Mr. Mascottia submitted declarations on all of the elements set forth in the Board of Trustees in Seymour decisions. That evidence is uncontroverted. And the only information or argument that is made in response to that uncontroverted evidence is, well, there was some kind of weird relationship between U.S.A. Payment and U.S.A. Processing. But the district court correctly found that it's not the relationship between those two companies that the court is to focus on. It's to focus on the relationship between the shareholders, officers, and directors of the company of which it is alleged to be the alter ego. Because that's the way they set it up, not because they might not have been able to set it up the other way. Because that's the way – that's the alter ego claim that they're making. Correct. It's not that U.S.A. Payment and U.S.A. Processing are alter egos of each other. It's that Mr. Cucinotta and Mr. Moscatia are the alter egos. The precedent, at least in the labor field, for looking at the question of transferred business between two corporations commonly owned as being very strong evidence of alter ego status. Between the corporations, not necessarily toward the individuals. Well, first of all, I submit there's no evidence of that in this case. But he says there is. We're back in the same circle. He says there is. And I say there's not. And I say people – I mean, if he doesn't succeed on the – but if he were to succeed on the RICO claim, that would be on the basis that there is some evidence that there is. Otherwise, he's not going to get anywhere on the RICO claim. But there is some kind of – That there is some reason to think that there was a transfer of business from – that's his premise. That's what he says his premise is. And I will accept that for purposes of today. That is not, in all honesty, Your Honor, what I understood it to be throughout this case. But if that were the case – It's not about that. What is it about? It has been my understanding that the RICO claim is a separate claim against Mr. Cucinato and Mr. Moscatia talking about whether a contract should have been with USA Processing instead of USA Payment, and that whether or not Mr. Cucinato and Mr. Moscatia are alter egos of USA Processing, my reading of the pleading is that it's not – that that's not what that claim is about. Why does he need an alter ego theory to allege his RICO – to have a RICO claim, assuming he meets the other elements? I don't think he does. In fact, I actually – I actually disagree, and I probably should agree and sit down, but I don't.  I understood his theory to be what you just articulated, and I couldn't quite understand why he was – I don't quite catch why he was so insistent on proceeding with this particular alter ego theory. I'm not sure. But just in closing, with respect to the colloquy about discovery in the case, there was adequate opportunity for the plaintiff to get discovery in this case. Before the summary judgment. Before the motion. If you look at the declaration of Ann Marie Wagner, which is the supplemental excerpts on the record, 625 through 630, and then there's some attachments to it, 964 through 987. Those detail all of the efforts where I invited Mr. Gamble to meet and confer with me to tell me what discovery he wanted to do, to do some discovery. Nothing ever happened. Since we're talking about things that aren't on the record, there actually was – were some depositions that were scheduled for the day the opposition was due, and Mr. Gamble canceled them. Okay. Thank you very much. Thank you, counsel. I'll use my time up, if it's possible. One minute. One minute. Just two things. It's been a long morning. In particular, Your Honors, the gross fees in the NPA is basically language that says shall mean all – shall mean the aggregate sum of all fees and charges, and it's very broad, very inclusive. That's paragraph 12 of the NPA. Also, that paragraph – I have a question to which I would like a very short answer. Who are the defendants in the RICO claim? Repeat again. Who are the defendants in the RICO claim? The defendants in the – Robert and Kareem. Robert Kuchinada and Kareem Mosquitieh. The – And U.S. processing is out of that claim, then? Yes. U.S. processing is out of that claim. You're suing them. Either you win or you lose. Why do you need an alter ego claim, too? Repeat. What do you need an alter ego for? If you're suing them, then you either win or you lose against them. You're not suing a corporation and you need to get behind the corporation. You're suing them directly. Suing them directly for obfuscating these funds from the corporation. Right, right, right. The alter ego thing, what does it have to do with anything? As long as we get our money. Anyway. Thank you, counsel. Just last one comment. They said they would not divert any money from the net proceeds agreement in paragraph 12. This is a complete case of diversion.  Thank you, Your Honor. Thank you very much. We appreciate your arguments and the matter will stand submitted.
judges: Hawkins, Paez, Berzon